We'll move to our argued case on the calendar this morning, number 21-533, Wiggins v. Griffin. Ms. Loeb. Thank you. Good morning. May it please the court. Jennifer Loeb for the appellant, Robert Wiggins. This is a case about a prisoner who was denied access to religious services for five and a half months, despite his repeated requests to attend, simply because the prison moved him from one cell block to another. The district court erred in granting the prison official's summary judgment on these facts for at least three reasons. First, a rational jury could find what the appellees now concede, which is that their conduct was not justified by any legitimate penological interest. Second, because a rational jury could find that they unreasonably violated his free exercise rights without justification, the appellees were not entitled to qualified immunity. And third, a rational jury could also find that each appellee was personally involved and acted with at least deliberate indifference. In addition, while the- So why do you think that they could be found to have acted with deliberate indifference? Is your argument that maybe they actually received the messages from Wiggins and just refused to add them to the list? Or is it the argument that I think you make in your brief, which is it's deliberately indifferent because they were using this system, the call-out list, to let people attend religious services? Well, Your Honor, I think it's the combination of both, really, which is what we argued in our brief. So you think that it's possible that actually Copp or Griffin received the messages and then just decided, well, I just don't care. I'm not going to put them on the call-out list. I certainly think that a rational, reasonable jury would be entitled to find, based on the facts, based on this record, that the fact that each of these appellees was in charge of instituting this policy at the prison. So you've got Superintendent Griffin, whose responsibility it is to- He said he didn't remember receiving the first letter. So his responsibility- Your Honor, he said he didn't recall receiving either letter. Certainly, there's evidence in the record to suggest that he did something about the second letter. But in this case, it's his responsibility to implement the Directive 4202 relating to religious services. Your Honor, but what you've just described isn't necessarily knowledge, right? He could be negligent in not monitoring his correspondence. It's the combination of his responsibility for overseeing this policy plus the fact that on at least two occasions it was brought to his attention. Superintendent Griffin admits in the record, in the appellee's answer, they admit that Mr. Wiggins sent these two letters. These two letters were sent to him. He has the responsibility for instituting this policy. It's ultimately his responsibility. And so it's the responsibility plus the fact that this was brought to his attention on more than one occasion. He also says he gets a lot of letters with many complaints from the prisoners. Unlike cases where this circuit has held that receiving one or two letters isn't enough for a very, very senior prison official, somebody, a commissioner, the chief medical officer of the prison system globally, this is his job. This is ultimately – and it's an incredibly important part of his job, religious services. I get that it's his job, and so I'm saying maybe he was negligent. Actually, maybe we should clarify first. Do you agree that to show a violation, to succeed in a 1983 claim, there needs to be more than negligence? I don't think this panel has to reach that question. As the court noted in Brandon, it's an open question. But on these facts, you have at least deliberate indifference, and so the court – At least deliberate indifference. But what you just described, that it's his responsibility, but he's not paying attention to his correspondence, and so maybe didn't even see the letter, that doesn't seem like deliberate indifference. That seems like negligence, doesn't it? So fundamentally it's a question for the jury to resolve. This is a question about his mens rea, his mental state. On what basis could the jury conclude that that was deliberate indifference? They would have to conclude that he actually received and saw the letter and just didn't care, right? Yes, he admitted that it was sent, so a jury could find that it was received. So you're saying that the evidence that it was sent, you know, could be a basis for the jury concluding that he received it and saw it and then just didn't do anything about it? Exactly. That he was on notice at least as early as May and that it was several months before he took any action with respect to his obligation to enforce this policy. And then he only took action when a grievance was filed. Isn't that true? That's actually not true, Your Honor. That's certainly what my opponent argues in their brief. But the record makes clear that it's Assistant Deputy Superintendent of Programs Howard who says in his declaration that it was actually in response to the letter. So the very same mechanism that Mr. Wiggins had availed himself to in May, which he re-availed himself to in September, it's that letter that ultimately gets forward to him that causes him to fix it. It's not the grievance. And so, well, the district court spent a lot of energy talking about the formality of that grievance. But again, that doesn't really tell us whether it's deliberate indifference or negligence, right? Because it could be that he's actually not very good about paying attention to his correspondence. And so he missed the first letter but then saw the second letter. And it's all about just what happens to get in front of his eyes. Well, and this circuit has been clear to establish. You know, we cite it in our brief, Gelb, in the year 2000. Summary judgment is generally inappropriate where questions of intent and state of mind are implicated. And so here you certainly have enough in the record that a rational, reasonable jury could find otherwise. Mr. Wiggins didn't ask for summary judgment on these facts. We're not here on a cross motion for summary judgment. But this district court judge inappropriately, wrongly decided a genuine issue of material facts. So just to clarify it then, so Wiggins says he sent the letters and they don't dispute that he sent the letters. That's the only evidence that Griffin received the first letter, right, or that he saw it. You don't have other evidence that, like, actually somebody saw him reading it or put it on his desk or whatever. So the evidence is that he sent it. And then I guess for Copp, you had testimony from the chaplain, Jeb Amani, that says that he sent a message to Copp. So I guess you would suggest the same thing, that that's enough evidence to say that she got them. Even though she testified or swore that she didn't see it or get the message, that might be enough for a jury to conclude that she did and that she just didn't care. Is that your position? So for Pele Copp, I think it's the same as with Superintendent Griffin, but it's more. So again, she's responsible for overseeing religious programming. She admits that. You're right that Jeb Amani states in his declaration that it was his responsibility to receive these callout requests, forward them to her, and that she was required to then submit them to the guidance office. So that's the testimony there. She also says in her declaration she knew the system was imperfect. She knew that oversights and mistakes happened because it was this manual system. She knew that it wasn't updated? I'm sorry, Your Honor. She knew that the system was not updated regularly? She admits in her declaration that she knew it was a manual system, that sometimes when mistakes like this happen, it's because it's not updated. So again, she knows that it's an imperfect system. What does that tell us, that she knows it's imperfect? It seems like you have two theories of deliberative difference. One is maybe she did get the message and just didn't act on it because she didn't care about them being added to the callout list. The other one, it seems like you're saying, well, she knew that this system would lead to delays and didn't do anything to fix it, and you think that is also deliberative difference. But those are two different things. So I guess the latter one doesn't rely on her actually receiving any messages in this particular case. No, I think, Your Honor, the former is certainly our primary argument, but I think it's informed by the latter because it goes to the likelihood, the foreseeability that this could be an issue. You could imagine a system that always worked flawlessly and that there were never any problems with. And so, and I see that my time is up. If the system worked flawlessly and you could imagine a situation where a defendant says, I had no idea, I had no reason to know or suspect or worry because the system always works. You have quite the opposite here. You have defendants, appellees who are admitting that they know that there's kind of a problem with the system. So you're saying negligence looks more like deliberate indifference when the official knows that you actually need to be paying attention to stuff coming in because there are problems with the system. I think it goes to their reason to know that there was a problem there. Talk about the other defendants. So Jeb Amani, he does act when he gets a message, right? So why is he deliberately indifferent? So a few things. So first, he's in charge. He's certainly the front line, right? He's the person who sees these parishioners, these believers every week when they come to his services. He's been in that position since 2007. He knows the appellant in this case, Mr. Wiggins. He states in his declaration that he specifically relies on inmates to tell him when there's a problem. He says, I rely on communications from inmates to let me know if there's an issue. So that's exactly what Mr. Wiggins- Didn't Wiggins send messages with some other people to him that he got during services? Absolutely, Your Honor. And he got them, and he sent a request to COP to put Wiggins on the call-out list. Doesn't that mean that he was not deliberately indifferent? So he gets the letter from Mr. Wiggins. We think a jury would be entitled to believe that Mr. Hill, the other inmate, sent these other call-out requests with him. Mr. Wiggins says that happened on three or four occasions. Mr. Giabamonte seems to lend some credence to that because he says that on every occasion that he received a call-out, he took appropriate action. We know that he did because on two different occasions he sent this interdepartmental memo to Ms. Copp on June the 5th and July the 27th. And so, yes, in some respects he is acting on these requests. But every week he sees that it's not working. Every week he sees that Mr. Wiggins is not there. You're saying he should have done more. It's his responsibility to make sure that the prisoners in that facility are getting the religious services. In a sense, maybe he should have done more, but he did something. And so it doesn't seem like deliberate indifference if he does something but not enough. Again, we haven't asked for summary judgment on that deliberate indifference. We're simply arguing today that a jury would be entitled to find, based on these facts, based on these repeated efforts, based on the fact that he let it go week after week after week without following up and fixing it, that that was deliberate. Mr. Howard, right, is also a defendant. So he's not, there's no evidence that he received any messages and refused to act on them, is there? Well, so Mr. Howard is personally involved for the same reasons that Ms. Copp is personally involved. He's also responsible for co-supervising the religious programming. He also, in his interrogatory responses, refers to himself as the deputy superintendent of programs. And so a jury would certainly be entitled to find and to believe that, just like Ms. Copp, when these call-out requests went to the deputy superintendent of programs, which is what Mr. Jebimani says, that Mr. Howard was also a recipient of those notifications. The record also shows that when super- How would you make that inference? I mean, I guess it is true that Jebimani says, I send it to Copp, and then Copp sends it to the person responsible for administering the list, and that's Howard, right? Well, actually, Jebimani doesn't say that he sent it to Copp. He says he sent it to the deputy superintendent, and both Ms. Copp and Mr. Howard claim to be the deputy superintendent. And so on this record, there is certainly a genuine issue of material fact as to who received those correspondences, and a jury would be entitled to find that it was one, both, or- So can I ask this question? So you're saying that they should have paid more attention to their correspondence or acted on it, or maybe, in the case of Jebimani, done more when he saw that Wiggins wasn't at the services. But why wouldn't qualified immunity protect them in that circumstance by saying, well, it wasn't clearly established that they had to do more than respond to requests that are put right in front of them? So we would submit, as we argued in our briefs, that it was clearly established that he had a right to be at services, to go to the religious faith of his choosing, absent- So the question is not whether he has a right to go to religious services. The question is whether he has a right to the prison officials having tight oversight of the call-out list or monitoring every correspondence that comes in because the violation is not – they didn't deny him the right to do that. It's not like – obviously, we had a case where he said, I want to go to Protestant services, and they said, no, we're not going to let you. There's no question they would be denied qualified immunity. But in this case, his claim is he was entitled to extra efforts on their part to monitor their correspondence and correct deficiencies in the call-out list system, right? Well, Your Honor, I disagree with your characterization because he did say I want to go to services when he established his religion on his card and when he asked to be added to the call-out list. So that is his indication in his declaration that I want to go to services. And the appellees – Let me clarify that. So I guess that's right. So if the state of the fact is that actually there's enough evidence to suggest that the requests were in front of these officials and they just didn't care or didn't act on them, then you're saying, well, they're just denying him the right to go to services. Absolutely. But if the state of the facts are that the requests came in and they missed them because they weren't paying close attention to their correspondence or monitoring requests from prisoners or in the case of Giamatti, not taking extra efforts when he notices that his requests aren't working, that's not just denying a request to go to services. That's about a failure to exercise tighter oversight over the call-out list system, right? No, Your Honor. Again, I would disagree. I think here, unlike some of the cases that find that the defendants are entitled to qualified immunity where they had no reason to know that what they were doing was implicating rights. So, for example, the case of an administrative prison search where they misplaced some artifact or some item in a prisoner's cell that has some religious significance. They may not have reason to know that in executing a search of a cell that they're implicating rights. But here you're talking about one of the most fundamental protections that he's entitled to while he's incarcerated, which is the right to free exercise. So, in other words, this is one of the most fundamental and important rights that these officials are in charge of overseeing. So it's not some attenuated mistake that they had no reason to know. This is the system. This is how it works. It needs to be enforced and it needs to be protected in order to work. Otherwise, you are denying prisoners the right to attend their services, which is exactly what happened here. And you have that in the record. You have Mr. Wiggins testifying that he asked an officer who came by to effectuate the call-out. And he said, oh, man, you're playing with me. Like, I've got to be on the list. And he's like, no, I don't play when it comes to religious services. That's the kind of sanctity with which this system needs to work. And so there is a clear – and your Honor said nobody's disputing that there's a clearly established right, but my opponent is disputing that. The district court found that he – Well, I think there's – I would suggest that there's a dispute of that the right to attend religious services is clearly established. It's whether that right was at issue in this case is what's disputed. I think this court –  I'm sorry. Answer. You can answer, Judge. That wasn't a question. It was a comment. You can go ahead. Is it your argument that repeated instances of negligence finally can be characterized as deliberate indifference? Yes, and I think that's part of our argument, yes. Repeated instances of somebody not acting when they should can raise a factual question, can allow a jury to find deliberate indifference. That's what the case law in this circuit and other circuits that have been cited in the brief say with respect to deliberate indifference. It's not just mere negligence on one occasion. And several of the cases that my opponent cited in his brief spell out, you know, one occasion or two occasions over a long period of time where something went wrong or something fell through the cracks. That's not what we have here. You can imagine a situation where we were coming before you and saying, he fell off the list in September. He wrote a letter. They fixed it right away. That would be a very different case, I would submit to the panel, a very different case than what you have here, which is he fell off the list. He asked to be put back on. He wasn't put back on. He sent some call-out requests. Those weren't answered. He sent messages with inmates. Those weren't responded to. He asked the officials who were walking around on the call-out list. Actually, isn't the record that initially he sent two letters and then he just, then for about five months he was sending kind of informal requests to other prisoners and talking to guards? So, again, my opponent characterizes those requests as informal, but his testimony is that they were written, that they were, that he wrote them, that they were call-out slips. And remember, Mr. Giabamonte says he relies on this kind of communication to do his job. So there's certainly a reason for Mr. Wiggins to believe reasonably that this is how you get things fixed. I sent a letter. I don't want to bother them because I've had bad experiences in the past when I send too many letters, which is what he testified to. So I don't want to, you know, they're doing their job and I want to give them space, but also I want to go to religious services. So I'm going to follow up. I'm going to send a note. I'm going to ask someone to ask about it. I'm going to talk to the officials. And, again, this division between formality and informality is really a red herring because the record is clear that it was the letter that fixed it. So the very first thing he does is send a letter. And the very last thing he does is send a letter, which fixes it. So, if anything, it shows just how easy it would have been to fix if they had been doing their jobs, paying attention, and fixing this, what they characterize as a mistake or an oversight. Okay. Thank you, Ms. Loeb. We have that argument. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the State. Thank you. Mr. Del Pozo. Thank you, and may it please the Court, Eric Del Pozo for the defendant, Greenhaven Prison Officials. The grant of summary judgment to defendants should be affirmed. The evidence fairly construed for the plaintiff doesn't make out any actionable free exercise violation, let alone the violation of a clearly established right. Do you agree that repeated instances of negligence, as I just asked the opposing counsel, would finally lead us to conclude that there was deliberate indifference? Maybe in some circumstance, Judge Pooler, but not on these facts, because there weren't repeated instances of negligence. It's important to note that Mr. Wiggins sprinkled his requests to be restored to the call-out list around to various recipients. And the analysis, as your honors have noted, goes defendant by defendant. So let's start with Superintendent Griffin. He received one informal letter in May 2017, concededly didn't act on it. Superintendent Griffin receives hundreds of letters per week, runs a 2,000-person prison. Mr. Wiggins then sent an informal letter to Chaplain Giabamani in May 2017, and some notes to fellow, passed along some notes through fellow prisoners that went to an inmate services clerk, not to Giabamani. But Giabamani took action and forwarded, sent two memos to the Office of the Deputy Superintendent. That would be both Copp and Howard, asking for Mr. Wiggins to be restored to the list. Now, Mr. Wiggins' testimony on this point, I think, is apt. He said that should have been enough. What Giabamani did should have been enough. And somebody must have dropped the ball. That is, even using Mr. Wiggins' terminology, textbook negligence at most. Not deliberate indifference. And I'll give a counter-example. Mr. Giovanni, who was the religious leader of the prison, knew Mr. Wiggins and knew that he was not attending services. I will dispute that last premise, Judge Pooler. Mr. Wiggins testified that Giabamani would not have known that Mr. Wiggins was absent on any given day. And Giabamani, in his affidavit, said that these religious services had between 60 and 180 attendees. So I don't think it's a fair characterization of the evidence that he would have known that Mr. Wiggins wasn't there on any given day. The fact that Wiggins says somebody must have dropped the ball doesn't mean that that's necessarily what happened. Is it also plausible that Giabamani sent the messages to Copp and Copp saw them and just didn't care? That is not a fair inference on this record, given all of the evidence. Nothing suggests that any defendant saw Mr. Wiggins' request and said, no, I'm not going to add you back to the list. So I guess that's my question. So we have testimony. We have evidence. So Wiggins says he sent the letter to Griffin. Giabamani says he sent messages to Copp requesting that he be put on the list. They say they didn't see those letters or messages. But why isn't that a factual dispute as to whether they got them or not? I do agree. So I'll start with this premise. Do you agree that if, in fact, Griffin saw the letter and was indifferent to the request, that would state a claim? That might tend to show – And if Copp saw the request and wasn't indifferent to it, it would state a claim. That, again, might tend to show the difference. So we have evidence that messages were sent to them, and they say they didn't see them. Why isn't that a dispute of fact? Well, I'll point to a critical piece of evidence, and that is that in September 2017, when Mr. Wiggins sent another letter to Superintendent Griffin and on the same day filed a formal grievance, he was promptly restored to the list. And so they show, to borrow terminology from Judge Palouse's question, they did care. They did care that Mr. Wiggins was omitted. So you're saying it's implausible and no reasonable jury could conclude that Griffin saw the first letter because somebody who was indifferent to the first letter would not have acted so promptly on the second letter? That is what we are arguing. And even if there is some factual inference of negligence or possibly something more, not every reasonable official would have acted in the – or the evidence doesn't show that no reasonable official could have acted in the way that these defendants did, and defendants would be entitled to qualified immunity for that reason and for another reason that I'll get to. But I want to address briefly why negligence – But again, that still depends on them not seeing the letter. So I think that I see the argument that if they were merely negligent and not monitoring the correspondence or the messages, then maybe as qualified immunity they're not required to do that. But as you, I think, conceded, if they in fact saw the messages and were indifferent to them, then there might not be. Yes, and indifferent, Your Honor. And we don't think the evidence fairly construed leads to our conclusion of indifference, both because of how Griffin did react when he indisputably saw the letter. So since you said it has to go defendant by defendant, so okay. So you have an argument that, well, Griffin – it's not plausible that Griffin saw the first letter and didn't act because he acted so quickly on the second letter. There's not a similar argument to Copp, right? So there's evidence that Giammatti sent messages to her, and she did not act. Now, she says she didn't see them, but there's a dispute there, right, as to whether she received them and failed to act or whether she just didn't receive them. Not a material dispute, Your Honor, because Copp also said that, per her practice, she would have forwarded them to the guidance office and they would have wound their way to the inmate services clerk who then would have had the ultimate responsibility for entering them. Mr. Wiggins also testified that that's who he thought his notes were ultimately going to, and this is, for that reason as well, simply at most a negligence case. And I will also add the evidence shows, as Your Honor mentioned earlier, that Mr. Wiggins didn't follow up on his requests. The defendants thus had no further notice after these incidents that were – these episodes that we're talking about ending in July 2017 that Mr. Wiggins was omitted from the list and could reasonably have thought, or at most negligently, unreasonably have thought that the matter had been either resolved or abandoned. And that gap of time is meaningful in the totality of the evidence analysis, as is the response that ultimately came when Mr. Wiggins filed his formal grievance and sent the letter in 2017, September 2017, to Superintendent Griffin. I'd like to touch very briefly, I won't belabor the point on why negligence should not be, why it wasn't sufficient to make out a free exercise claim. We argued below, and the district court agreed that there wasn't sufficient evidence of sufficient knowledge on the part of defendants to show their personal involvement, which has a mens rea component. So despite what my adversary has argued, we believe this argument is sufficiently preserved. And the legal question, purely legal question, of what the requisite standard should be is something this court can and should reach in this case. That having negligence be enough for a free exercise violation would turn potentially ordinary incidents of prison administration into potential free exercise claims, such as mislaying an inmate's property that he would like to use for religious services, leaving a pillow on the stairs, causing a slip and fall that- It's not wrong to mislay property without being negligent. It's just that if you, if it's caused by your lack of care, a violation of a duty of care, then it would lead to liability. It's not that just every accident would lead to liability, right? Sure. That's right, Judge Manasci. But every, we'll say, unreasonable act causing injury, bounded only by principles of tort causation, could then be shoehorned into a free exercise analysis and create a subspecies of prison reform litigation far afield from known deprivations of- So that's a policy reason why negligence shouldn't be the standard. But is there something about the nature of a free exercise clause claim that the standard should be deliberate indifference as opposed to negligence? Why isn't it some version of the argument that opposing counsel was making that this is like a crucial thing that should be treated with a kind of sanctity and prison officials who have custody of these folks should treat it with the utmost care? Well, I'll address that particular argument in a moment. But yes, allowing free, allowing negligence to sustain a free exercise claim would conflict with the Supreme Court's articulation of the standard for these claims in Turner and alone, which requires as an essential element, as this court held in Salahuddin v. Gord, or Salahuddin v. Coughlin, excuse me, that the state show a rational connection between what it did and the deprivation of the prisoner's rights. That standard would be difficult if not impossible to meet if negligence were the standard and the plaintiff could proceed showing that the state officials acted irrationally. It would stack the deck unfairly and conflict with what the Supreme Court has held to be the articulation of the test. Even if this court thinks that the evidence shows potential negligence, it can't be said that no reasonable official would have acted on this record in the way that these defendants did and the defendants were therefore entitled to qualified immunity. And this argument is twofold. Qualified immunity can be based on a mistake of law or a mistake of fact. Those overlap here. There's no clearly established right to attend religious congregate prayer in any and all circumstances, as this court recently held in Booker, a facility-wide security lockdown could provide one good reason. So that's the way you define the privilege, right, to attend congregate prayer. But RFRA is much broader. You have burdened his practice and his religion. Yeah, that's right. Judge Booler, this is purely a free exercise claim, though, and so the RFRA analysis, while somewhat relevant, doesn't control here. And we're under the standards of qualified immunity for free exercise claims as this court has described them in prior cases. Booker is particularly on point here because it does hold expressly that there is no right to attend congregate prayer in all services. If you're in the special housing unit for punitive reasons, that can be a legitimate deprivation, or at least not a clearly established violation. Here Mr. Wiggins claims a violation starting from the date on which he transferred cells, so April 8th, 2017. There's no clearly established right to an automatically updated. He doesn't seem to have a reason for denying him access to the religious services. This isn't like he was being put in a cell to penalize him, right? As you're saying, it's an oversight or negligence or a mistake, so it's not like they have an argument to say, well, we thought we could deny him access to religious services because he was being quarantined for safety reasons. That's right, Judge Menasche, and that is why we are not arguing that we satisfy step two of Alone and Turner, that there's a valid penological purpose to what these defendants did. But these qualified immunity cases that you're citing, that there's no categorical right to religious services, that doesn't seem to apply here either, because everybody agrees that he was deprived of something to which he was entitled constitutional right. That's right, but that principle is the building block from which qualified immunity in this case flows. So for the moment from the cell block transfer in April 2017, there's qualified immunity because there's no clearly established right to an automatically updated list. My adversary has made some strenuous arguments for why there should be an automatically updated list, at least for religious call-outs, to preserve the sanctity of prisoners' ability to attend congregate prayer, and whether or not those arguments are valid, that doesn't make out a clearly established constitutional violation, currently not having such a system. And then once the evidence shows that Mr. Wiggins began informally notifying various prison officials, corrections officers, fellow prisoners, like I said he sprinkled all these requests around, that he was omitted from the list, at a minimum a reasonable official, some reasonable official, could have thought that given Mr. Wiggins' well call not to be pejorative, a failure to follow up, and the lack of notice that any defendant received for several months over the summer, that the matter had been abandoned or resolved. So under cases like Roe against Hernandez, the Supreme Court case, which explores the mistake-of-fact qualified immunity ground, the defendants are entitled to qualified immunity for that reason as well. So you agree that the district court was wrong to say that Mr. Wiggins didn't suffer a substantial burden on his franchise rights, right? Yes, Your Honor, thank you, and that's where I was about to go. We argued and the district court held that Mr. Wiggins hadn't shown a substantial burden, primarily because of his failure to follow up on his informal complaints when he still wasn't added to the list. Now that doesn't, that's a fact that undercuts deliberate indifference, but after this court's emphatic pronouncement in the Sabir decision in footnote 9, that it is clearly established in this circuit that a deprivation of congregate prayer is a substantial burden on religion, we don't think that argument is on the table any longer. And so the substantial burden element in this case is on this meeting. That's the ground on which the district court decided this case, right? That was, or one of two grounds. The district court also held the defendants entitled to qualified immunity. Part of the district court's substantial burden analysis, though, was more of a personal involvement or mens rea type holding that no defendant, the evidence didn't show that any defendant had sufficient reason to know of the violation, and so the court can affirm on that independent ground. There is no need to reach the substantial burden question. Judge Pooler? Before we get there, I guess my question is, if there seems to be this dispute over whether there's enough facts to infer that the prison officials had knowledge and therefore could be deliberately indifferent or that it just only rises to the level of negligence, why wouldn't we just say, well, the substantial burden analysis was wrong, but the district court should do it over by focusing on the mental state question? Why should we resolve that in the first instance? Well, we don't think this case should be remanded at all, given the lack of I'm saying, well, since it seems like it's an evidentiary question, and the district court didn't really sort it out in the first instance, shouldn't it do that instead of us doing it on appeal? Well, the state of the law and the state of the record are such that the court could safely hold as a matter of law that the substantial burden element is met. We would not dispute that on a remand. You can cheat that, don't you, in your briefing? We do, Judge Pooler, and I was about to say, I recognize that you were on the panel that ordered briefing on that element, and so I hope that that was not all futile effort that resulted. If this court were inclined to opine on the substantial burden element, for all the reasons we've given in our brief, we think it retains some gatekeeping function, a very limited function, but that the test should be more than pure sincerity. There should be a quantitative and a qualitative screen to make sure that purely de minimis claims or mere assertions Why is that? Oh, because of de minimis claims. Because of de minimis claims. If somebody could have a sincere religious belief that some policy is central, imposes on the centrality of their religion, and yet a court could still say, well, even though that's your sincere religious belief, we think it's de minimis, and so we're going to not take it seriously. Only in rare circumstances, Your Honor, say a claim like the one that the D.C. Circuit mentioned in Leviton, a Catholic saying that his religion requires him to wear sunglasses every day, or I'll give another one. Wouldn't the argument there be sincerity? It would, but courts normally don't second-guess sincerity, say on a motion to dismiss or on summary judgment, we accept the plaintiff's evidence is true normally, and that includes Actually, I mean, if you thought he was sincere, and that actually he had a genuine religious belief that wearing sunglasses was central to his religion, I mean, people can have weird religions, can't they? That's right, and I'm not saying that could never stay the claim, but that analysis should properly be a little more probing. A prisoner in that circumstance should have to allege some facts about his religion, whether he's practiced this according to this belief in sunglasses in the past, whether he's worn them in the past, not simply to come to court and say my religion requires X. I'll give an example that may seem farcical on its face, but it is the kind of claim that we think the substantial burden element, a low but meaningful threshold, properly screens out, and that's a prisoner saying that his religion requires ice cream or filet mignon seven days a week, and now if on a motion to dismiss or summary judgment under normal evidentiary standards, the court would have to accept the sincerity of that belief is true, and all we're saying is that there's But you're saying that suggests that somebody's not being sincere. They're being opportunistic in making that claim. It seems to go to sincerity rather than the objectivity of the belief. That's right. We're not arguing that there should be any inquiry, and we don't think that after employment division against Smith, there really could be properly be an inquiry into the verity or objective plausibility of a belief or the century, even the centrality, if you want to use that word, of the belief in the religion. But what we're saying is that there needs to be some check, whether it's on sincerity or what we'll call the importance of the belief to the plaintiff and plaintiff's counsel. You're saying that there shouldn't be an inquiry into centrality, but there should be an inquiry into the importance of the belief. Only insofar as it screens out purely de minimis claims, and I'll give a loose analogy, say, on Title VII burden shifting on the third step. The court asks whether there's sufficient evidence that the employer stated reasons are predictable. That's the type of analysis that we think would be appropriate, and it's the type of analysis that some courts that have adopted a pure sincerity It sounds like you actually do think that there's a modification of the standard, that it's not just the full-throated substantial burden standard, but you think there should be some inquiry into like a de minimis burden would not state a claim. That is exactly – That's true of all rights, right? So like if you have a violation and you say, well, okay, there's technically a violation, but it like only took you five minutes to avoid the obstacle, a court might say, well, you don't state a claim because there just wasn't a serious infringement. I mean that seems like a general principle. And so what you've just described, Judge Menasche, is more of a quantitative analysis, say a prisoner alleging that he missed one or two non-holiday meals or one or two weeknight Bible study classes. We would say that that should be screened as insubstantial or de minimis quantitatively, but there's also a qualitative aspect for a belief that, and I'll quote this court's language from Ford v. McGinnis, that's so bizarre that it can't plausibly be deemed as a sincere or important part of a plaintiff's religion. We think that that should be the test. I mean hasn't the court essentially told us, the Supreme Court told lower courts, you can't just say somebody's religion is too bizarre to be believed. I mean that seems like that's trolling through people's beliefs and evaluating the quality of them. Well, what the court has said, and most recently in Hobby Lobby,  And so to the extent that the analysis looks like, starts to look like, we're saying that a plaintiff who the evidence or allegations show could plausibly, sincerely believe this just has a wacky religion. No, the court should not be second-guessing that. It should be a check on sincerity and actual religiosity as opposed to a secular predilection invented for the occasion. And all we're saying is that that is not a normal function of a court on a motion to dismiss or on summary judgment, but it's important in this context. And it is what some courts that have adopted a pure sincerity test continue to do, such as the Third Circuit. Can I just go back to one question I asked before which I'm not sure I got the answer, which was whether it's too fact-intensive to decide that there just is no evidence of a culpable mental state here. So why, if the district court didn't lay this out for us, should we decide now there's no way a jury could conclude that at least some of these defendants saw the requests and were deliberately indifferent to them? And so, Judge Manasci, I apologize. I might have misunderstood your prior question. If this court were to hold that negligence is not enough for a free exercise claim, but remand to the district court for a defendant-by-defendant analysis of whether the evidence shows, potentially shows deliberate indifference, that would be one suitable course for the court. But the evidence, as we've laid it out in our brief, we've done it defendant-by-defendant. It's a question of law. The court can, in our view, just as easily make that determination. Opposing counsel, whether repeated negligence could lead to a finding of deliberate indifference. She said yes. Don't you say yes as well? Yes on some other set of facts. It would have to be negligence to the point, say, if Superintendent Griffin had gotten 12 letters. I'm just pulling that number out of the air. And not acted on any of them, and then put in an affidavit saying I get a lot of letters, perhaps that would be a case where the principle that you've just articulated, Judge Pooler, might come into play, but that's not this case. With one letter to Superintendent Griffin, one letter to Jeb Amani, and a couple of notes to the Protestant Services Clerk, and then two memos to the Deputy Superintendent of Programs. Although this plaintiff testified that he was accused in the past of complaining too much, and so he was trimming his tails so as not to get in trouble with the prison authorities. He did, in fact, testify to that. But those are his internal reasons, and while we don't doubt that those might have been his or were his reasons for not following up, it's the effect of his not following up and the fact that it deprived defendants of the required notice that they would have needed for a claim of deliberate indifference, or frankly, to do what they ultimately did if they had gotten a little bit more notice, which is just to add Mr. Wiggins back to the call-out list. I'll conclude by saying I'm not trying to minimize what happened to Mr. Wiggins, and I will concede that this was less than perfect prison administration. We hope that this will not continue in the future, but the facts here simply do not make out a compensable violation of a clearly established right. Thank you very much, Mr. Del Pozo. I will turn back to Ms. Loeb on rebuttal. Thank you. The district court in this case found that there was no substantial burden, in part because he found that Mr. Wiggins wasn't that bothered by what happened, because he had this inaction for five months. That's what the district court found. But as the panel's questions would suggest and as the arguments we made in our brief show, there was considerably more that Mr. Wiggins did in those intervening five and a half months to get this issue in front of the right people to be fixed. And so it would just be inappropriate to conclude as a matter of law on this record that their failure to act was only negligence. A jury could certainly find that having put this issue properly before these people who are in charge of overseeing this policy on repeated occasions, in repeatedly different ways, through people, through notes, through prison officials, through guards, through letters, that he was doing what he could to get this fixed. And at the end of the day, they've now conceded that this is a substantial burden, that there's no justification for what happened to him, and that it happened to him for nearly six months. There's a policy in place that's supposed to allow him access to services, and it failed him. The individuals who are in charge of overseeing that policy failed him. And it can't be that they stand up now and say, well, we had no reason to know. How could we know? We had no reason to know. It wasn't reasonable to us. That's the qualified immunity analysis. He said it again. My opponent said it in his argument. He also said it in his brief, and I want to call the Court's attention to it. He said, as it relates to the second prong of qualified immunity, these officials could have thought they were doing enough. These officials could have thought that the system was working. That's not the standard on summary judgment. The Court found that a reasonable jury could only find, these officials only thought that they were doing enough. And the record here shows they could have and should have done more. It was their job to do it. They were on notice repeatedly over almost six months. They repeatedly failed to act. They were in charge of fixing it, and they didn't. Mr. Wiggins put forward in his brief, for all he knows, it was deliberate. For all he knows, they were angry at him. He can't know what's in their head. He's not responsible for knowing it. And so we've argued it's certainly deliberate indifference. It may very well be intentional. A jury may find that there's no valid excuse, that these facts are so terrible that no reasonable prison official can stand up and say, this really important right and this super faulty system, I guess I just missed the letter. That's unacceptable. A jury could find that that's unacceptable. And that's why we ask that this Court were manned to the District Court. It was inappropriate to take this case away from a jury where there is so much disputed fact as to what was happening in this situation. Okay. Thank you very much. Thank you. And I just thank the appointed counsel for the lovely brief they filed. And of course, the State as well. But thank you. Thank you very much, Ms. Loeb. The case is submitted. And because that is the only argued case on our calendar this morning, we are adjourned. Court is adjourned. Thank you.